UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| RAVI DARBHA, | ) | |
| | ) | Case No. 10 C 2581 |
| Plaintiff, | ) | |
| | ) | Judge Virginia M. Kendall |
| v. | ) | |
| | ) | |
| CAPGEMINI AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**RULE 56.1 STATEMENT OF**
**UNCONTESTED MATERIAL FACTS**

Defendant Capgemini America, Inc. ("Capgemini"), in support of its motion, pursuant to Fed. R. Civ. P. 56, for summary judgment dismissing the claims of plaintiff Ravi Darbha ("Darbha"), and pursuant to Local Rule 56.1 of this Court, hereby submits this statement of material facts as to which Capgemini contends there is no genuine issue of material fact and that entitle Capgemini to a judgment as a matter of law.

**Description Of The Parties And Jurisdiction**

1. Defendant Capgemini provides, <u>inter</u> <u>alia</u>, information technology ("IT") and software outsourcing services. Capgemini's outsourcing employees generally work full-time on one client account at a time. (See Defendant's Verified Second Amended Responses to Plaintiff's First Set of Interrogatories ("Capgemini's Interrogatory Responses"), which is annexed to the

Silver Aff. at Ex. 40, at Response No. 1 p. 3).[1]

2. Darbha is a software consultant specializing in the software language Java (Darbha Tr. 6-9, 202).

3. In the past, Darbha moved from employer to employer and/or project to project as technology projects ended (Darbha Tr. 6-8, 16, 18-19, 20).

4. Darbha, who resides in Buffalo Grove, Illinois, purports to assert claims of (i) discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII") based on national origin (India) and race (Asian), (ii) discrimination under the Age Discrimination Employment Act ("ADEA") based on age (43),[2] (iii) retaliation under Title VII, and (iv) harassment/hostile work environment under Title VII.  (Ex. 39).

**Darbha Joins The Astellas Account.**

5. In or about July 2006, Darbha joined an IT outsourcing engagement Capgemini had with Astellas, a pharmaceutical company in Illinois (Darbha Tr. 21, 26).

6. Darbha was on Capgemini's "R&D Team" on the Astellas account, which supported software applications relating to Astellas' research and development efforts (Darbha Tr. 26-27).

---

[1]  "Silver Aff." refers to the Affidavit of Gerry Silver, Esq., sworn to on August 18, 2011 and submitted herewith. "Ex." refers to exhibits to the Silver Aff.  "Darbha Tr." refers to the transcript of the deposition of Darbha conducted on April 4, 2011, a copy of which is annexed to the Silver Aff. as Exs. 1a (pp. 1-120) and 1b (pp. 121-232).

[2]  All ages set forth herein are as of the time of Darbha's employment termination from Capgemini on May 1, 2009.

7. Darbha focused primarily on the Argus application, which captures complaints and other "incidents" from subjects of trial drugs and reports them to the FDA and other regulatory authorities (Darbha Tr. 31, 33).

8. Glenn Johnson ("Johnson") was the Applications Delivery Manager on Astellas in charge of the R&D Team and other Capgemini software teams supporting other divisions at Astellas. Darbha reported directly to R&D Team Project Manager Hal Malen ("Malen"), who reported to Johnson. (Darbha Tr. 209, 23-26, Ex. 40 at 1 p. 4).

9. Ted Levine ("Levine") was the Account Executive for Capgemini who managed the overall Astellas relationship, and Samantha Linsky ("Linsky") was Capgemini's Human Resources ("HR") Director assigned to the Astellas account (Darbha Tr. 28).

10. Linsky was involved in all relevant decision-making activities regarding Darbha in 2008-09 and verified Capgemini's Responses to Interrogatories (see Ex. 40 at Responses 1 p. 4, 2 p. 5, 3 p. 7, 8 p. 10, 9 p. 11, 17 p. 17, 18 p. 18, 19 p. 19, 30 p. 28 and 36 pp. 32-33).

**Darbha's Performance On The Astellas Account**

11. In Darbha's 2007 Mid-Year Review, Malen wrote that Darbha "sometimes give[s] the impression of not working with the team - not my responsibility", and that Darbha should more proactively monitor potential problems (Ex. 2).

12. Further, in discussing the review with Darbha, Malen told Darbha that it sometimes "sounds that you [Darbha] don't want to work" (Darbha Tr. 29-31). Darbha does not believe that Malen discriminated against him (Tr. 25-26).

13. Dan Page ("Page") became the Project Manager for the R&D team in January 2008 (Tr. 25-26).

14. In addition to Johnson, Page and Darbha, approximately six other Capgemini consultants performed certain R&D duties on Astellas (Darbha Tr. 28, Ex. 37), namely Angela

3

Brent ("Brent"), Mohammed Momin ("Momin"), Kiran Nallagonda ("Nallagonda"), Pete Bucchianeri ("Bucchianeri"), Gennady Sergiyenko ("Sergiyenko"), and Aaron Steen ("Steen") (Darbha Tr. 43, Ex. 37).

15. Brent, Momin and Steen had roles that were more client-facing and were referred to as "Domain Leads" while Bucchianeri, Sergiyenko, Nallagonda and Darbha were analysts (Ex. 4 p. CG 134-35, Darbha Tr. 38, 185-86).

16. Darbha did not report to any Domain Leads but rather reported directly to Page, and Darbha also dealt directly with the client at Astellas (Darbha Tr. 39-40, 44).

17. In his 2008 Mid-Year Review, Page pointed out certain deficiencies in Darbha's performance that were similar to those pointed out by Malen, such as that Darbha would "refuse to help with any critical applications issues", that Darbha would "rely [ ] on others to make it their issue" as well as that Darbha was failing to train a back-up in case of his absence and/or emergencies (Darbha Tr. 57-60; Ex. 5).

18. Subsequently, in the mid-Summer of 2008, there was an emergency where the Argus application was "down" and Darbha was called upon to address the situation. Darbha refused to take a break from lunch to attempt to fix the problem. (Darbha Tr. 63-64, Ex. 6).

19. Around the same time, there was an Argus hardware failure, where a database server was out for a week, and Darbha took no steps to escalate the issue to management as he felt that because it was a hardware issue relating to Argus, as opposed to purely an Argus software issue, it was not his responsibility to do so (Darbha Tr. 64-67).

20. Thereafter, Astellas complained to Page that Darbha was not being accountable for the Argus application (Darbha Tr. 71; Ex. 6).

21. Further, Darbha had not trained a back-up (Darbha Tr. 79-80, Ex. 7).

4

**Darbha Is Placed On A Performance Improvement Plan**

22. Accordingly, on September 9, 2008, Johnson and Page put Darbha on a Performance Improvement Plan (a "PIP") (Darbha Tr. 76; Exs. 7, 8).

23. Among other deficiencies Johnson and Page asked Darbha to improve upon, they again requested that Darbha train a back-up, escalate issues, and be more accountable (Darbha Tr. 79-80, Exs. 7, 8).

24. Page met with Darbha regularly to address Darbha's progress on the PIP (Darbha Tr. 116-17, Exs. 11, 15, 19).

25. By October 2008, Page acknowledged that Darbha had successfully completed nearly all the items on the PIP, other than fully training a back-up, which was only 60% complete, and better escalating and communicating issues to Capgemini management and the client, which was only 20% complete (Darbha Tr. 101, Exs. 9 and 11).

26. By January 2009, Darbha had fully completed the PIP and the PIP was closed (Darbha Tr. 102).

27. However, Page gave Darbha a "4-Needs Improvement" rating on his 2008 Year-End Review (Ex. 33). Page told Darbha that although Darbha had fulfilled the PIP through his efforts in late 2008 and early 2009, the rating reflected his performance throughout the entire year (Darbha Tr. 171-72).

**Astellas Transfers The R&D Portion Of The Astellas Account To Another Firm**

28. In January 2009, Levine announced that Astellas had decided to transfer the R&D applications away from Capgemini to a new consulting firm, Delta, effective April 30, 2009 (Darbha Tr. 147-48, 151-52, Ex. 20).

29. Capgemini, including Levine, specifically told the members of the R&D Team, including Darbha and even Page, that they needed to find new positions within Capgemini by

5

April 30, 2009, or else their employment would be terminated effective May 1, 2009 (Darbha Tr. 149-52, 197, Exs. 20, 40). Darbha testified that he was told at that meeting "[s]o we [meaning Darbha and the rest of the R&D Team] have to find something with Capgemini or you're done" (Darbha Tr. 149-52, Ex. 20).

### Darbha Attempts To Find A New Position At Capgemini

30. Accordingly, Darbha began looking for a new position within Capgemini (Darbha Tr. 154).

31. Capgemini HR explained the procedure for trying to find open positions, of which Darbha was already aware from his prior experiences at Capgemini when an account closed and Darbha had to find a new position (Darbha Tr. 16, 18-19, 20, 154).

32. Darbha went onto Capgemini's internal web-based system to search for open positions. He "started looking" but "did not find [an opening] with [his] exact skills". He applied to a number of positions anyway, knowing his employment would end by May 1, 2009 if he did not find another position. (Darbha Tr. 154-55).

33. Darbha posted his name and skills on the Capgemini internal website, which HR and Project Managers would scan when trying to fill positions and to otherwise staff client engagements across Capgemini (Darbha Tr. 159-60; Ex. 22).

34. In a section asking whether the individual would be willing to relocate to fill a position, Darbha wrote "No" (he lived in Illinois) (Darbha Tr. 160, 163; Ex. 22).

35. Darbha listed his skills as primarily Java. Significantly, he did not list any skills with SAP software. (Darbha Tr. 161-62; Ex. 22).

36. Darbha researched open positions, but could not find any openings for anyone who, like him, primarily specialized in Java technology, i.e., Java/J2EE skills, with no SAP experience (Darbha Tr. 200, 201-02).

6

37. There were some positions that required a combination of Java and SAP skills, and Darbha applied for those, but he did not have any SAP skills and therefore was "not a complete match" (Darbha Tr. 202).

38. Darbha did not reference SAP skills on his resume and admitted openly that "I do not have SAP skills" (Darbha Tr. 207).

39. Darbha could not find another position because "[t]here were no open needs for only J2EE [Java] skills but [only needs with Java] linked with SAP experience" (Darbha Tr. 216 and Ex. 29) (the open needs were for Java "[a]nd SAP or only SAP").

40. Darbha readily admitted to Amy Singleton ("Singleton"), Capgemini HR director responsible for coordinating reassignments of Capgemini employees, that he had no skills in SAP (Tr. 217 ("I don't have any SAP skills, so that is what I told her")).

41. Indeed, Darbha wrote to Singleton "I do not have SAP skills" and that "[a]s I observe, majority of Cap requirements are for SAP skills" (Ex. 30).

**Darbha For The First Time Complains Of Discrimination**

42. On March 19, 2009, Darbha, for the first time, claimed to Page that Capgemini discriminated against and harassed him. Darbha did not give any reasons why he believed he was discriminated against, i.e., whether it was due to race, national origin, or age. (Darbha Tr. 172-73, Ex. 23).

43. Rather, Darbha merely told Page: ""Whatever is happening to me, it's -- I think it is discrimination and harassment', so I am making a claim -- verbal claim with him." (Darbha Tr. 172-173, Ex. 23).

44. On March 25, 2009, Darbha met with Capgemini HR representatives Linsky and Robin Curtis ("Curtis") regarding his discrimination/harassment claim (Ex. 23).

7

45. Curtis specifically asked Darbha the reasons that Darbha believed he was discriminated against. She asked whether Darbha believed it was because of any particular class he was in, such as "age, weight, etc." Curtis explained to Darbha that "[t]o be discriminated [against] you should have a class or reason". Darbha explained that he "does not know the reasons". (Ex. 23 at RD40; Darbha Tr. 182, 188).

46. Darbha told Linsky and Curtis that because he was placed on the PIP, given a "4" rating on his 2008 Year-End Performance Review and was not made a Domain Lead, he thought he was being discriminated against or harassed (Darbha Tr. 179-80) ("because of these incidents, I was discriminated and harassed"). (See also Ex. 23).

**Capgemini Helps Darbha Try To Find Another Position With The Company, To No Avail**

47. Singleton and Linsky continued their attempts to find Darbha a new role at Capgemini (see, e.g., Exs. 30, 31, 32, 35, 36; Darbha Tr. 210).

48. On one occasion, Darbha was not considered for the Warner Brothers account because he did not have SAP expertise and because he would not relocate to California (Ex. 36).

49. Johnson offered to act as a positive reference if anyone within Capgemini was considering retaining Darbha and otherwise supported Darbha's efforts (Darbha Tr. 184, 214).

50. Darbha has no knowledge of any one rejecting him for a position because he was put on a PIP or because of his performance rating (Darbha Tr. 210-211 ("I don't know because I don't know what they are doing")).

51. In Capgemini's attempts to find Darbha a new position, only Darbha's resume, skill sets and other comments that he himself inputted were posted (Ex. 37).

52. Darbha's 2008 performance rating and the fact that he had been on a PIP were not mentioned or readily accessible (Ex. 40 at 36 at p. 33, Ex. 37).

53. Darbha was terminated effective May 1, 2009 (Ex. 40 at 1 p. 5).

### Darbha Files An EEOC Charge, And Then Commences This Action

54. On July 29, 2009, Darbha filed a Charge of Discrimination with the Equal Opportunity Employment Commission (the "Charge" (Ex. 38)).

55. Darbha claimed that he had been discriminated against because of his race, national origin, and age. He also claimed that he had been retaliated against for "engaging in a protected activity", namely "I was placed on a Performance Improvement Plan and I complained to [Capgemini]. Subsequently I was discharged." (Ex. 38).

56. Darbha filed the Complaint in this action on April 27, 2010. Darbha claimed that he was discriminated against on the basis of race, national origin and age, and retaliated against. He also claimed he was harassed and/or subjected to a hostile work environment, and was "paid lower wages." (Ex. 39).

### Darbha Presents No Evidence Of Discrimination Based On National Origin Or Race

57. Darbha never heard anyone say anything that would cause him to believe he was being discriminated against because of his national origin or race (Darbha Tr. 220). Darbha is not aware of any facts indicating that Johnson, Linsky, Page, or Singleton discriminated against him (Darbha Tr. 223-24). He is not aware of any "specific person's name" who discriminated against him (Darbha Tr. 223, 225-26).

58. There were nine Capgemini employees on the Astellas R&D team. Five were initially considered for potential termination as a result of Capgemini losing the Astellas R&D work, including Page and Sergiyenko (both Caucasian). Also, initially considered were Brent (African-American), Nallagonda, who is Indian/Asian, and Darbha. Hence, just as many Caucasians were initially considered for potential reduction as those who were Indian/Asian (two each), one of whom was Darbha's direct supervisor, Page. (See Ex. 37; Darbha Tr. 220).

59. With regard to the four members of the R&D team who were not initially considered for potential termination, one of whom is Momin, who is Indian/Asian (see Exs. 37, 45). He provided different services to Astellas in addition to those related to R&D and Astellas specifically asked that he remain on the account performing such services, as well as to lead the transition to Delta (Exs. 37, 41). Similarly, Johnson, Bucchianeri and Steen, all Caucasian, provided services to Astellas outside of the R&D context and therefore were not considered for termination (Ex. 37).

60. Most significantly, two of the Indian/Asians on the R&D Account, Nallagonda and Momin, were retained beyond May 1, 2009, and one other non-Caucasian, Brent (African-American), was retained as well (Exs. 37, 45; Darbha Tr. 220).

61. Darbha is unaware of any facts indicating that he was paid lower wages because of his national origin or race (Darbha Tr. 231). Indeed, Momin and Nallagonda were paid the most on the R&D team (Ex. 43).

62. "Domain Lead" was not an official title within Capgemini. For example, although Steen was a Domain Lead and Darbha and Bucchianeri were not, they were all considered Senior Consultants within the Capgemini hierarchy. (Ex. 37).

63. Further, Darbha's salary was higher than that of Steen, who was a Domain Lead. (Ex. 43).

**Darbha Presents No Evidence Of Discrimination Based On Age**

64. Darbha never heard of anyone saying anything about his age that would lead him to believe he was discriminated against for that reason (Darbha Tr. 220).

65. Darbha admits that he is not aware of any facts indicating that he was discriminated against because of his age (43), other than his belief that he was the only member of the R&D team who was over 40 and he was terminated (Darbha Tr. 219).

66. However, Brent was 41 and found a role with the PDG group and remained with Capgemini. Bucchianeri, 48, also supported a key application for the Astellas legal department, and therefore remained with Capgemini. Johnson, 43, Page, 43, and Gennedy, 45, remained with Capgemini as well. (Ex. 37).

**Darbha Presents No Evidence Of Retaliation Or Harassment**

67. Darbha found out in January 2009 that he would be terminated if he did not find another role at Capgemini, and he did not complain about discrimination or harassment until over two months later in March 2009 (Darbha Tr. 147-48, 151-52, Ex. 20, Ex. 23).

68. Darbha did not tell Page, Linsky or Curtis that he believed he was being discriminated against or harassed due to his national origin, race or age (Ex. 23 at RD40, Darbha Tr. 179-80, 182, 188).

69. Darbha testified at his deposition that he believes that he was retaliated against because of an "incident" that occurred in 2007, where Darbha gave his password to contractor, who went into the production environment at Astellas and caused problems with the system (Darbha Tr. 230).

70. Darbha claims that he was harassed by being put on a PIP or receiving a negative performance review and/or for giving out his password to a contractor (Ex. 39, Darbha Tr. 230).

71. After Darbha's purported Complaint, Capgemini, including Linsky and Singleton, continued to help Darbha try to locate another role at Capgemini (see, e.g., Exs. 30, 31, 32, 35, 36), and Johnson encouraged Darbha in his attempts to find a new position and offered to provide a positive reference for anyone within Capgemini considering retaining Darbha. (Darbha Tr. 214, 184).

Dated: August 19, 2011

                    CAPGEMINI AMERICA, INC.

                    By: /s/ Gerald D. Silver
                           One of Its Attorneys

                      Gerald D. Silver, Esq.
                      (Admitted Pro Hac Vice)
                      Chadbourne & Parke LLP
                      30 Rockefeller Plaza
                      New York, NY  10112
                      Phone: (212) 408-5260
                      Fax: (646) 710-5260
                      gsilver@chadbourne.com

                      Cheryl Tama Oblander, Esq.
                      Nathan D. Larsen, Esq.
                      Butler Rubin Saltarelli & Boyd LLP
                      70 West Madison Street
                      Suite 1800
                      Chicago, IL  60602
                      Phone: (312) 444-9660
                      Fax: (312) 444-9287
                      CTama@butlerrubin.com
                      nlarsen@butlerrubin.com

**CERTIFICATE OF SERVICE**

The undersigned certifies that on August 19, 2011, a copy of the foregoing Rule 56.1 Statement was filed electronically with the Court. The undersigned also certifies that a copy of the foregoing Rule 56.1 Statement was served by U.S. First Class Mail, postage paid, at 30 Rockefeller Plaza, New York, NY 10112:

Ravi Darbha
1431 Johnson Dr.
Apt. 1024
Buffalo Grove, IL 60089

    /s/ Gerald D. Silver
One of the Attorneys for Defendant