IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| RAVI DARBHA, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | 10 C 2581 |
| | ) | |
| v. | ) | |
| | ) | Judge Virginia M. Kendall |
| CAPGEMINI AMERICA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Ravi Darbha ("Darbha") brought suit against his former employer Defendant Capgemini America, Inc. ("Capgemini"), alleging various acts of employment discrimination under the Age Discrimination Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621 *et seq.*, Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the Civil Rights Act of 1866, 42 U.S.C. § 1981. Specifically, Darbha alleges that Capgemini discriminated against him due to his age, national origin and race by terminating him, failing to promote him, and failing to stop harassment, as well as by creating a hostile work environment, retaliating against him for reporting the discrimination and denying him equal recognition. Capgemini now moves for summary judgment. For the following reasons, the Court grants Capgemini's motion.

## STATEMENT OF FACTS[1]

Capgemini provides IT outsourcing services to clients; its employees generally work full-time for one client account. (Def. 56.1 ¶ 1).[2] Darbha is an Indian male who resides in Illinois and has 15 years of software consulting experience. (Def. 56.1 ¶4; Pl. 56.1 Resp. ¶2). Darbha worked for Capgemini for approximately five years, providing IT services on long-term engagements at client sites. During his annual performance review for 2005 and 2006, he was rated a 3 out 5 as "Succeeds/Achieves." (Pl. 56.1 Exs. 2, 3). Darbha then joined the Astellas client site, where he received "highly satisfactory" reviews until some technical glitches with the Argus application, as well as some negative feedback, caused Capgemini to place him on a Performance Improvement Plan ("PIP") in 2008. That year, he received a rating of 4 out of 5 as

---

[1] Throughout this Opinion, the Court refers to the Parties' Local Rule 56.1 Statements of Undisputed Material Fact as follows: citations to Capgemini's Statement of Uncontested Material Facts have been abbreviated to "Def. 56.1 ¶__" and to its accompanying exhibits to "Def. 56.1 Ex. __"; citations to Darbha's Response have been abbreviated to "Pl. 56.1 Resp. ¶__"; citations to Darbha's Additional Statement of Undisputed Material Facts have been abbreviated to "Pl. 56.1 ¶__" and to its accompanying exhibits to "Pl. 56.1 Ex. ___." Darbha filed his Additional Statement of Undisputed Material Facts as Exhibit 30 to his motion in opposition. Capgemini failed to respond to these in their entirety, and consequently all of Darbha's material additional facts are deemed admitted, subject to the following admissibility limitations. See N.D. Ill. Local Rule 56.1(b)(3)(C). The purpose of Local Rule 56.1 statements is to identify the relevant admissible evidence supporting the material facts, not to make factual or legal arguments. See Cady v. Sheahan, 467 F.3d 1057, 1060 (7th Cir. 2006) ("statement of material facts did [] not comply with Rule 56.1 as it failed to adequately cite the record and was filled with irrelevant information, legal arguments, and conjecture"). Moreover, the requirements for responses under Local Rule 56.1 are "not satisfied by evasive denials that do not fairly meet the substance of the material facts asserted." Bordelon v. Chicago Sch. Reform Bd. of Trs., 233 F.3d 524, 528 (7th Cir. 2000). The Court may also disregard statements and responses that do not properly cite to the record. See Cady, 467 F.3d at 1060; Cichon v. Exelon Generation Co., LLC, 401 F.3d 803, 809-10 (7th Cir. 2005). Therefore, the Court will not admit or address the legal and factual arguments made in Darbha's Rule 56.1 statements and responses, nor the facts cited but unsupported by the record. See System Dev. Integration, LLC v. Computer Sciences Corp., 739 F.Supp.2d 1063, 1068 (N.D. Ill. 2010).

[2] In Darbha's 56.1 Response, he does not dispute Capgemini's 56.1 facts numbered 1, 4-6, 8-9, 13, 31, 35-36, 38-41, 43-47, 51, 55-56, 63-64, 68, 70. Consequently, those paragraphs are deemed admitted when they are properly substantiated by the record. See N.D. Ill. Local Rule 56.1(b)(3)(C); Parra v. Neal, 614 F.3d 635, 636 (7th Cir. 2010).

"Needs Improvement."  When Astellas announced in January 2009 that it was ending its contract with Capgemini, other employees sought other client engagements but Darbha was unable to match his skills to any open positions.  Darbha's termination letter in May 2009 from Capgemini stated that he was terminated due to a reduction in force.

### I.     The Astellas Project

In July 2006, Darbha joined Capgemini's IT project led by Glenn Johnson ("Johnson"), a Caucasian male, for the client Astellas, a pharmaceutical company in Illinois.  (Def. 56.1 ¶5, 8).  Darbha worked within the R&D Team, serving as the project lead for the Argus software upgrade, assisting Astellas clients directly, and helping other Capgemini team members beyond his assigned activities.  (Pl. 56.1 ¶3-5).  Dan Page ("Page"), a Caucasian male, became the Project Manager for the Astellas client in January 2008.  Page oversaw Angela Brent  ("Brent"), an African-American female, and Aaron Steen ("Steen"), a Caucasian male (the "Domain Leads").  (Def. 56.1 ¶13; Exs. 4, 37).  In turn, Brent and Steen oversaw the Analysts: Pete Bucchianeri ("Bucchianeri"), a Caucasian male, and Kiran Nallagonda  ("Nallagonda"), an Asian-American male.  (Def. 56.1 Exs. 4, 37).  Darbha is listed in the organizational chart as an Analyst who reported directly to Page rather than to a Domain Lead.[3]  (Def. 56.1 Ex. 4).

---

[3]  Darbha disputes this organizational chart by stating that clients would come to him directly, that all employees reported to Page, and that Page was also his own Domain Lead, and that Capgemini did "not produce documents, showing justification, why only some people were chosen as Domain Leads."  (Pl. 56.1 Resp. 15-16).  Darbha fails to support his challenge with any documentation other than his own self-serving description.  "'[I]t is . . . axiomatic that a plaintiff's conclusory statements do not create an issue of fact. . . .' An employee's self-serving statements about his ability . . . are insufficient to contradict an employer's negative assessment of that ability.'"  *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 740 (7th Cir. 2006) (quoting *Jackson v. E.J. Brach Corp.*, 176 F.3d 971, 985 (7th Cir. 1999) (internal citations omitted)).  Consequently, the chart is admitted.

Darbha's 2007 mid-year review stated that he should continue to be "innovative and keep on making recommendations for improvements on your applications. Keep on taking ownership of [ ] applications." (Def. 56.1 Ex. 2). The mid-year review also states Darbha "sometimes give[s] the impression of not working with the team-not my responsibility. You may be correct, BUT, it is how you respond."[4] (Def. 56.1 Ex. 2). His 2007 annual review rating was 3 out of 5 for "Succeeds/Achieves" and states that his "quality of work has been acceptable. He has shown competency in running Argus." (Pl. 56.1 Ex. 4).

## II.    Darbha's Performance in 2008

Darbha's 2008 mid-year review states that Darbha should not "refuse to help with any critical application issues" and should "stop relying on others to make it their issue" and should train a back-up resource. (Def. 56.1 Ex. 5). During his review meeting, Darbha disputed these criticisms as inaccurate, and insisted that he had never refused to train a back-up, and in fact had already trained Ray Moran ("Moran"), a Caucasian male who joined the Astellas project as a Domain Lead. (Pl. 56.1 Resp. ¶ 17). Subsequently, in June 2008, there was an emergency when the Argus application was "down" but Darbha did not return early from lunch to address it.[5] (Def. 56.1 ¶17). In addition, there was an Argus hardware failure, which Darbha failed to escalate to management.[6] (Def. 56.1 ¶18). Thereafter, Astellas complained to Page that Darbha

---

[4] Darbha disputes this point, stating that the "you may be correct" makes the criticism meritless, (Pl. 56.1 Resp. ¶11), which is merely argument. The fact is admitted.
[5] Darbha asserts that he addressed the emergency soon thereafter and that regardless, Moran was the Domain Lead and therefore responsible, despite Moran's shirking of his duties. (Pl. 56.1 Resp. ¶17). Darbha's response is merely argument and consequently the fact is admitted.
[6] Darbha contests that he eventually escalated the issue and regardless, it was the Domain Lead's duty and therefore Darbha should not be blamed. (Pl. 56.1 Resp. ¶ 19). Darbha's response is merely argument and consequently the fact is admitted.

was not being accountable for the Argus application.[7]  (Def. 56.1 ¶6).  Citing these incidents, Page and Johnson placed Darbha on a Performance Improvement Plan ("PIP") in September 2008.  (Def. 56.1 Ex. 7, 8).[8]  The PIP was considered complete on January 28, 2009 and officially closed on February 24, 2009.  (Pl. 56.1 Resp. Ex. 22).  Darbha's 2008 annual review stated that he "has good technical skills and supports a critical application" but based on "several performance areas that were discussed as part of the mid-year review, and a performance improvement plan," his rating was 4 out of 5 for "Needs Improvement."  (Def. 56.1 Ex. 33).

### III.    Darbha's Termination in 2009

In January 2009, Capgemini announced to the R&D Team that Astellas had decided to transfer its R&D applications from Capgemini to a new consulting firm beginning April 1, 2009.  (Def. 56.1 ¶28).  The Outlook meeting invitation required the R&D Team members' presence but Darbha was invited as "optional."  (Pl. 56.1 Ex. 24).  At the meeting, employees were told that the members of the R&D Team, including Page, would need to find new positions within Capgemini or be terminated.  Darbha inconsistently stated that his understanding of the

---

[7] Darbha disputes this point by saying Capgemini should have appraised Astellas of the facts.  (Pl. 56.1 Resp. ¶ 20).  This fails to dispute the fact.

[8] Darbha disputes the PIP in its entirety for being inaccurate and based upon events prior to the July-September review period (as detailed above) and that Page was unresponsive to his requests for feedback from his colleagues.  (Pl. 56.1 Resp. ¶22-26).  Darbha also disputes the PIP as being unfair because it was deemed complete then incomplete, and extended into January 2009.  (Pl. 56.1 Resp. ¶22-26).  Darbha asserts additional facts to discredit the PIP and its follow-up meetings, such as "[Page] flip-flops on the progress for point #2 (point:G) & did not re-phrase that point as agreed by him during 10-Nov-2008 meeting" and "Defendant already gave poor APR:4 showing PIP as the cause, on around 13-Nov-2008, Defendant was "required" to keep PIP open, beyond year 2008, hence extended PIP timeline."  (Pl. 56.1 ¶24).  These are factual and legal arguments that do not contest that a PIP was imposed, but rather, whether the PIP was appropriate and necessarily based on the circumstances.  *See Sublett*, 463 F.3d at 740; see also *Cichon*, 401 F.3d at 809-10 ("A district court does not abuse its discretion, when, in imposing a penalty for a litigant's non-compliance with Local Rule 56.1, the court chooses to ignore and not consider the additional facts that a litigant has proposed.").  Consequently, the facts in the PIP are admitted.

meeting's message was "we have to find something with Capgemini or you're done," (Def. 56.1 Ex. 20, p. 149-152), and also that at the meeting the team was told that "global R&D applications" (which would include Argus) were not affected by the contract termination. (Pl. 56.1 Resp. ¶28). Capgemini and Astellas modified their engagement contract to include a non-solicitation agreement that forbade Astellas from soliciting any Capgemini employees for 12 months without Capgemini's prior written consent. (Pl. 56.1 Ex. 18).

As instructed by Capgemini human resources, Darbha searched Capgemini's internal web-based system for open positions. Darbha states that he "applied for so many open positions, may be much more than anybody in the team, to no avail." (Pl. 56.1 Resp. ¶30). In the section asking whether the applicant would be willing to relocate to fill a position, Darbha wrote "no" and listed his skills primarily as Java. (Def. 56.1 Ex. 22). Darbha wrote to human resources that "[a]s I observe, majority of Cap requirements are for SAP skills." (Def. 56.1 Ex. 30). There were some positions that required a combination of Java and SAP software skills, and although Darbha applied for those, he did not have any SAP skills and stated that he was therefore "not a complete match." (Def. 56.1 Ex. 20, p. 202). Darbha told human resources that he would follow any new training or assignments as required for SAP skills development. (Def. 56.1 Ex. 30). Samantha Linsky ("Linsky") of human resources emailed Darbha's resume to other engagement resource managers to further assist him in his search for a project, to "find a home for him," stating that he would be willing to learn SAP "all the way around," as well as travel to client sites although he could not relocate. (Def. 56.1 Exs. 30-32, 36). On one occasion, Linsky emailed an engagement manager at Warner Brothers in Burbank, California, that Darbha was "currently

available and will travel" to the client site, but the manager responded that Darbha would not "be a fit" because the project could not accept travelers and the position required SAP skills. (Def. 56.1 Ex. 36).

Capgemini's internal project database required that an employee "meet minimum qualifications of the job to be considered" and "must not have recently had a performance rating of '4' or currently be on a performance improvement plan." (Pl. 56.1 Resp. Ex. 27). Yet to apply for a position, Darbha only had to post his resume, skills and self-reported comments—not his performance ratings. (Def. 56.1 ¶51). Darbha's performance ratings and the fact that he had been on a PIP were not mentioned or readily accessible to potential projects via the database. Darbha understood that his employment would end on May 1, 2009. (Pl. 56.1 Resp. ¶32).

On March 19, 2009, Darbha informed Page that he wanted to file a claim for discrimination due to his unfair reviews, unfair treatment and harassment. (Def. 56.1 Ex. 24). On March 25, 2009, human resources held a conference call with Darbha to address his claim, but he could provide no basis for why he believed was being discriminated.[9] (Def. 56.1 Ex. 24). On April 23, 2009, human resources held a conference call with Darbha to inform him that their investigation led them to find the PIP was warranted and under-inclusive of documented deficiencies, and

---

[9] The lengthy human resources notes from the conference call include the following excerpts: "[HR] asks why do you feel you are discriminated or harassed. Ravi mentions that the PIP points & the process are like harassment. Ravi mentions that the PIP was like retaliation [for an incident.]." . . . "Ravi also mentioned that he believes the PIP was to make him look as non-performing person and remove him from team with less benefits." . . . "[HR] asks do you think others are favored over you? Ravi says yes. Why were they favored? Ravi does not know the reason and interested to know from the people who made this decision. Ravi says someone like [Page]/[Moran]/[Momin] was named as [Domain Lead] who never did any application DL support activities." . . . "[HR] asks why do you think they picked [Momin] over you? Robin asks why you think you are left over because of your age, weight etc. To be discriminated against you should have a class or reason. Ravi does not know the reasons but interested to hear from the client." (Def. 56.1 Ex. 24).

that they concluded Capgemini did not discriminate or harass him. (Def. 56.1 Ex. 23). As of April 30, 2009, Linsky was still helping Darbha search for an open position, and emailed him that "if something comes up over the weekend or early next [Capgemini] will be able to keep you on board" and that human resources sent follow up emails to "a number of resource coordinators/hiring managers last night." (Def. 56.1 ¶34). Darbha was terminated effective May 1, 2009, and his termination letter stated the reason as "reduction-in-force." (Pl. 56.1 Ex. 14).

On July 29, 2009, Darbha filed a Charge of Discrimination with the Equal Opportunity Employment Commission. (Def. 56.1 Ex. 38). He claimed that he suffered discrimination on the basis of race, national origin and age, as well as retaliation for "engaging in a protected activity" in that he was "placed on a Performance Improvement Plan and I complained to [Capgemini]." (Def. 56.1 Ex. 38). Darbha later filed the Complaint, claiming he suffered discrimination on the basis of race, national origin and age, and that he suffered retaliation, harassment and a hostile work environment, and was "paid lower wages." (Def. 56.1 Ex. 39).

## STANDARD OF REVIEW

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether a genuine issue of fact exists, the Court must view the evidence and draw all reasonable inferences in favor of the party opposing the motion. *Bennington v. Caterpillar Inc.*, 275 F.3d 654, 658 (7th Cir. 2001); *see also Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 255 (1986). The Court, however, will "limit its analysis of the facts on summary judgment to evidence that is properly identified and supported in the parties' [Local Rule 56.1] statement." *Bordelon v. Chicago Sch. Reform Bd. of Trustees*, 233 F.3d 524, 529 (7th Cir. 2000). Where a proposed statement of fact is supported by the record and not adequately rebutted, the court will accept that statement as true for purposes of summary judgment. An adequate rebuttal requires a citation to specific support in the record; an unsubstantiated denial is not adequate. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

A "genuine issue" in the context of a motion for summary judgment is not merely a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, a genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000).

## DISCUSSION

Darbha alleges that as a result of his age, race and national origin, he received lower wages and fewer benefits, was not promoted and was exposed to a hostile work environment. Darbha further alleges that these conditions led to the termination of his employment.

### I.     Discrimination Based on Age

The ADEA prohibits employment discrimination against employees over the age of forty. *See* 29 U.S.C. § 621 *et seq.* To establish a violation of the ADEA, a plaintiff must demonstrate that he suffered an adverse employment action because of his age. *See Monaco v. Fuddruckers, Inc.*, 1 F.3d 658, 660 (7th Cir. 1993). A plaintiff must allege facts that age was the "but for" cause of the employer's adverse employment decision. *Gross v. FBL Fin. Servs., Inc.*, 129 S. Ct. 2343, 2350, 174 L. Ed. 2d 119 (2009) (an act or omission is not considered a "but for" cause of an event if the event would have occurred without it).

A.      **Establishing a Prima Facie Case**

A plaintiff creates a presumption of unlawful discrimination by establishing a prima facie case of discrimination.[10] *See Bahl v. Royal Indem. Co.*, 115 F.3d 1283, 1290 (7th Cir. 1997). To establish a prima facie case of discrimination under the ADEA, a plaintiff must put forth evidence that: (1) he belongs to a protected class; (2) he performed his job according to his employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) similarly-situated employees outside the protected class were treated more favorably by the employer. *See Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 978 (7th Cir. 2004) (explaining the burden-shifting method set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). Summary judgment is appropriate if a plaintiff fails to establish any of these elements. *See Atanus*, 520 F.3d at 672. If a plaintiff establishes each of these elements, he creates a presumption that shifts the burden to the employer to "produce a legitimate, noninvidious

---

[10] Darbha does not present direct proof of discrimination, therefore the Court will only analyze his claim pursuant to the indirect method, wherein he must create a presumption of discrimination. *See Atanus v. Perry*, 520 F.3d 662, 672 (7th Cir. 2008).

reason for its actions." *Id.* at 673. If the employer satisfies its burden of production and rebuts plaintiff's prima facie case of discrimination, the burden shifts back to the plaintiff to show that the employer's reasons are false and only a pretext for discrimination. *See Id.* at 672.

Here, the parties agree that Darbha satisfies the first and third elements of a prima facie case: he belongs to a protected class because he was a 43-year-old Indian at the time of his termination and he was in fact terminated. The parties dispute the second and fourth elements: whether Darbha performed his job according to Capgemini's legitimate expectations and whether similarly-situated employees outside of the protected class were treated more favorably than Darbha.

### B. Meeting Legitimate Expectations

Capgemini has demonstrated through documented performance evaluations that Darbha was not meeting legitimate expectations at the Astellas client site. Darbha asserts that he was performing according to Capgemini's legitimate expectations because the negative 2008 mid-year performance evaluation, PIP process, and 2008 annual performance evaluation contain multiple inaccuracies and misrepresentations. In meetings and emails during the PIP process, he presented Page and human resources with specific rebuttals to the criticisms that he felt were unfounded. By directly disputing the bases of the criticism both then and in his motion, Darbha insists that he has provided evidence from which a reasonable jury could find that he was meeting Capgemini's legitimate expectations. However, even when giving Darbha the benefit of the doubt that his justifications are accurate, the rebuttals do not create a genuine dispute. They primarily contain unsupported, self-serving statements and do not address the specific

11

critiques contained in the evaluations about Darbha's interactions with his team. Darbha cannot establish an issue of fact upon his own contentions that the evaluations were an inaccurate reflection of his performance. *See Lasisi v. Motorola, Inc.*, 2005 WL 2240109, *1 (N.D. Ill. 2005); *see also Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir.1997) ("hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial").

For example, Darbha presents as a factual assertion that he contacted a Capgemini colleague Domain Lead named Ragin Bhagat ("Bhagat") to ask whether Darbha had failed to train him properly, and Bhagat "told Plaintiff, over phone, that he did not give any such bad feedback" and then sent an email to Page informing him that "training was indeed complete 100%." (Pl. 56.1 ¶23). Yet the exhibit that Darbha attaches to substantiate this fact is an email chain in which Bhagat simply sent Darbha a spreadsheet of training sessions completed by Darbha. (Def. 56.1 Ex. 18). Moreover, a senior manager whom Darbha cc-ed on the email chain cut off Darbha's subsequent questions by stating that Bhagat, as a Team Leader, had "more important things to pay attention to instead of answering these questions." (Def. 56.1 Ex. 18). Darbha conjectures that is evidence that "Defendant interrupted Plaintiff from getting to the facts by email because their accusations were meritless." (Pl. 56.1 ¶23).This speculation without factual support fails to negate the asserted facts set forth by Capgemini. *See Albiero v. City of Kankakee*, 246 F.3d 927, 933 (7th Cir. 2001); *Drake v. Minn. Mining & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) ("'Rule 56 demands something more specific than the bald assertion of the

general truth of a particular matter[;] rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted.'").

Furthermore, the record shows that even prior to when Page joined the Astellas project in 2008, Darbha's 2007 mid-year review noted that he "sometimes give[s] the impression of not working with the team" and his 2007 annual review noted that his "quality of work has been acceptable." (Def. 56.1 Ex. 2; Pl. 56.1 Ex. 4). Clients at Astellas specifically asked for Momin rather than Darbha to serve as the Domain Lead during Capgemini's transition to its replacement IT services firm. (Def. 56.1 Ex. 41). The record fails to portray Darbha as a stellar employee who was made the scapegoat for his colleagues' shortcomings in 2008; rather, the record indicates that Capgemini evaluated his performance based on his team's interactions, in addition to the client's, and that the PIP was eventually closed in 2009.

Darbha's adverse employment action occurred when he was unable to find an open position at another client engagement and was terminated on May 1, 2009. When a plaintiff is seeking a new position with his employer, he must show that he was qualified for the position he sought. *See Dooley v. Abbott Laboratories*, 2009 WL 1033600, *10 (N.D. Ill. April 17, 2009). The record clearly shows that Darbha did not meet Capgemini's legitimate expectations after the Astellas project ended, because he was not qualified for an open position due to his lack of SAP skills, his evaluation of 4 out of 4, and his lack of interest in relocating. Darbha attempts to rebut this fact by claiming that Capgemini ensured he could not qualify for an another position; his theory, in summary, is that Capgemini: i) intentionally added a non-solicitation agreement to its contract with Astellas that would prevent Astellas from hiring him as a full-time

13

employee; ii) put him on a PIP on charges of shirking Domain Lead duties for which he was not accountable as an Analyst; iii) wrongly based his 2008 annual review on his PIP; iv) knowingly extended the PIP into 2009 to ensure he remained a "4" and that he otherwise would have received a "3"; v) flagged him as a "4" employee so that he would be ineligible to join a different client engagement; vi) failed to clearly inform him that he would be terminated if he did not join a different client engagement.  The problem with his argument is that it is merely that–-argument based on conjecture and speculation.  He cannot point to a single fact to support the theory while Capgemini points to a year-long record of performance issues, personal interaction issues, and limited skills–-all of which prevented him from being qualified for a new position. Significantly, Darbha cannot and does not challenge the truth that the loss of the Astellas account resulted in loss of jobs for Capgemini employees.  He only challenges his inability to obtain one.  Factually, however, he is unable to show that he was qualified for the available positions.

Instead, the record shows that in the internal project database, only Darbha's resume, skills and self-reported comments were posted.  (Def.  56.1 ¶51).  Even though the internal project database required that an employee "meet minimum qualifications of the job to be considered" and "must not have recently had a performance rating of '4' or currently be on a performance improvement plan," Darbha's performance ratings and the fact that he had been on a PIP were not mentioned or readily accessible to potential projects.  (Pl. 56.1 Resp. Ex. 27). Again, Darbha disputes this by stating that his career record would be accessible at some point in the hiring process, nothing in the record reflects support for this speculation.  In fact, the

record shows that Linsky and the human resources team were helping him find another open position: they emailed numerous managers at other engagements, going beyond Darbha's self-reported refusal to relocate and lack of SAP skills, to indicate that he would travel and would learn any SAP skills, without ever mentioning his past performance. See Def. 56.1 Exs. 30-32, 34, 36. Evidently, the human resources team went above and beyond in assisting him—rather than hindering him as would be expected in an employment discrimination suit. The evidence is such that a reasonable jury could not infer the facts in Darbha's favor. *See Insolia v. Philip Morris, Inc.*, 216 F.3d 596, 599 (7th Cir. 2000). The Court finds that the record clearly shows he did not have the SAP skills, did not live near client sites, or both, as required by open positions at other client engagements. Furthermore, he rejected positions that suited his Java skills because he refused to relocate to that client site. Darbha has failed to establish the element that he met Capgemini's legitimate expectations to extend his employment past the completion of the Astellas project; consequently, he is unable to substantiate a prima facie claim of discrimination. *See McDonnell Douglas*, 411 U.S. at 802.

### C. Showing Similarly-Situated Employees

Even if Darbha had established that he met Capgemini's legitimate expectations, he still fails to establish that similarly-situated employees outside of his age class were treated more favorably. Darbha tstated that he did not hear anyone mention his age in a way that would lead him to believe he suffered discrimination on the basis of age, though he believes he was the only member of the R&D Team who was over 40 and was terminated. (Darbha Tr. 219-220). However, the record shows that Brent, 41, was also flagged for reduction-in-force but found

another role after the R&D engagement ended at Astellas and remained with Capgemini. (Def. 56.1 Ex. 37). Bucchianeri, 48, joined the legal department engagement for Astellas, and remained with Capgemini. Johnson, 43, was leading other application service projects at Astellas, was unaffected by the end of the R&D engagement, and remained with Capgemini. Page, 43, was flagged for reduction but transferred to the Global Tools team and Gennedy Sergiyenko ("Sergiyenko"), a Caucasian 45-year-old male, was flagged for reduction but moved to a Sybase/Oracle role; both remained with Capgemini. Steen, 30, provided CLS application support that Astellas specifically requested past the end of the R&D engagement and remained with Capgemini. Nallagonda, 31, was on a temporary three-month assignment at Astellas, left the engagement in January 2009 and was terminated in September 2009 due to reduction in force. Mohamed Mohin ("Mohin"), a 25 year Asian-American male, had unique Documentum skills that Astellas requested he continue to provide to their legal department after the R&D engagement ended, and was no longer at Capgemini as of September 2010. In Darbha's motion, he fails to raise a single argument of age-based discrimination to prove that Capgemini treated more favorably similarly-situated employees who were outside of his age class. Instead, the record shows that Capgemini both retained employees in his age class and terminated employees outside of his age class. Consequently, Darbha has failed to establish the element that similarly-situated employees outside of his age class were treated more favorably. Capgemini is entitled to summary judgment on Darbha's claims of discrimination based on age.

## II.    Discrimination Based on Race

Darbha also contends that Capgemini discriminated against him due to his race and national origin as an Indian, in violation of Title VII of the Civil Rights Act and 42 U.S.C. § 1981. Courts analyze a plaintiff's "claim for discrimination on the basis of age in the same manner as his claim for discrimination on the basis of race, color and national origin." *Akinbode v. Motorola, Inc.*, 2007 WL 2316951, *8 (N.D. Ill. August 13, 2007). Of the four members of the R&D Team who were not initially considered for termination when Astellas ended its engagement contract with Capgemini, the three Caucasians—Johnson, Bucchianeri and Steen—provided services to Astellas outside of the R&D context and therefore were retained beyond May 1, 2009. (Def. 56.1 Ex. 37). The fourth, Momin, Asian-American, was retained specifically due to his "unique skill set of Documentum that is difficult to find in the market place." (Def. 56.1 Ex. 37). Three members of the R&D Team who were flagged for termination—Brent, African-American; Page, Caucasian; Sergiyenko, Caucasian—were retained beyond May 1, 2009, because they switched to different groups within Capgemini. (Def. 56.1 Ex. 37). The record shows that Capgemini was not differentially treating its employees according to invidious racial classifications. Darbha argues that Capgemini "assigned new role for people without matching skills/experience & also there was none evidence produced to substantiate Defendant's claim that these resources were asked for, by client." (Doc. 42, p. 10). However, this argument fails to prove the element that similarly-situated employees outside of his race class were treated more favorably. Darbha is unable to set forth a prima facie case of discrimination based on race.

Summary judgment is the "put up or shut up" stage of a plaintiff's lawsuit, when the plaintiff bears the burden of presenting evidence sufficient to persuade a rational fact-finder

17

that he has brought a legitimate claim. *Koszola v. Board of Educ. of City of Chi.*, 385 F.3d 1104, 1111 (7th Cir. 2004). Darbha has failed to substantiate prima facie claims of discrimination based on both race and age when Capgemini terminated him. To the extent he is claiming that he suffered discrimination by being placed on the PIP, earning unequal pay or not being made a Domain Lead, none of these three claims was mentioned in his EEOC Charge that he filed on July 29, 2009, and consequently all three are barred. *Sitar v. Ind. Dep't of Transp.*, 344 F.3d 720, 726 (7th Cir. 2003) ("Generally, a plaintiff may not bring claims under Title VII that were not originally included in the charges made to the EEOC."); *see Atkins v. Coca Cola Enterprises, Inc.*, 2007 WIL 4219196, 7 (N.D. Ill. November 2007) (a claim of discrimination is barred if the plaintiff does not allege the unlawful employment practice in the EEOC Charge); *see also Mokry v. Partylite Worldwide, Inc.*, 2009 WL 2588888, 7 (N.D. Ill. August 20, 2009) (a claim of discrimination is time-barred if the plaintiff does not file an EEOC Charge within 300 days after the alleged unlawful employment practice occurred). Darbha testified that he is unaware of any facts establishing that he was paid lower wages due to his national origin, race or age. (Def. 56.1 Ex. 1, p. 231). Indeed, Momin and Nallagonda, both Asian-American males, received the two highest salaries of the entire R&D Team. (Def. 56.1 Ex. 43). Consequently, Capgemini is entitled to summary judgment on Darbha's claims of discrimination based on race and national origin.

### III. Retaliation

Darbha also contends that Capgemini retaliated against him when he filed his EEOC Charge. Though the Court has already concluded that Darbha cannot maintain a

discrimination claim under either Title VII or the ADEA, Darbha could still have a claim for retaliation if he was punished for complaining about discrimination, which is a protected activity. 42 U.S.C. § 2000e-3(a); *Miller v. Am. Family Mutual Ins. Co.*, 203 F.3d 997, 1007 (7th Cir. 2000). To establish such a claim, Darbha must prove that: (1) he engaged in a protected activity; (2) he suffered an adverse employment action subsequent to this protected activity; and (3) a causal connection exists between the two. *Sitar*, 344 F.3d at 728.

Capgemini announced in January 2009 that the Astellas project was ending and that the R&D Team would be terminated, but Darbha did not complain about discrimination or harassment until March 2009. That Darbha's actual termination date occurred in May, after he filed his complaint in March,"is not evidence of causation" because the decision to terminate his employment (if he was unable to find another open position within Capgemini) was made months earlier, in January. Darbha cannot create an issue of retaliation by filing a discrimination claim prior to the end date of his employment. *See, e.g.,Clark County Sch. Dist. V. Breeden*, 532 U.S. 268, 273 (2001) ("Employers need not suspend previously planned transfers upon discovering that a Title VII suit has been filed, and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality."); *Derosena v. Gen. Bd. of Pensions*, 560 F. Supp. 2d 652, 672 (N.D. Ill. 2008). Darbha argues that "only on 01-Apr-2009, [he] believed that his employment ends 'any way' by 01-May-2009," which would place his complaint prior to his termination. (Pl. 56.1 Resp. ¶32). Darbha's own factual assertions theory of his case undermines his claim for retaliation since he alleges that Capgemini intentionally hid from him that he was flagged for termination as early as January

2009—which means Capgemini could not have retaliated against him after he reported his claim of discrimination in March. Darbha fails to establish the causal connection that he was terminated as a consequence of his complaints. Furthermore, even after Darbha made his complaint to human resources, the record shows that Linsky and her team continued to help him try to locate an open position, even through the weekend before his termination. Consequently, Capgemini is entitled to summary judgment on Darbha's claim of retaliation.

## IV. Harassment and Hostile Work Environment

Conditions of employment designed to harass and humiliate an employee because he is a member of one of Title VII's protected classes may constitute an adverse employment action. *Hilt-Dyson v. City of Chi.*, 282 F.3d 456, 466 (7th Cir. 2002). Darbha must offer evidence that a supervisor or co-worker harassed him because of his protected characteristic such as his race, national origin or age. *Wyninger,* 361 F.3d at 975. However, "the harassing conduct must be actionable harassment—severe or pervasive—before it will be considered an adverse employment action." *Id.* (citing *Stockett v. Muncie Ind. Transit Sys.*, 221 F.3d 997, 1001 (7th Cir. 2000)). "When the workplace is permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993) (citations omitted). In determining whether an environment is hostile or abusive, a variety of factors are considered including, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Saxton v. American*

*Telephone & Telegraph*, 10 F.3d 526, 534 (7th Cir.1993) (quoting *Harris*, 510 U.S. at 22).  Darbha's

claim is that he suffered harassment in the form of a negative performance review and the PIP

process.  These are hardly abusive conditions; they are realities of an office environment in the

professional services industry in a tough economy.  Furthermore, Darbha offers no evidence

that these workplace performance reviews were due to a protected characteristic such as his

race, national origin or age.  Consequently, Capgemini is entitled to summary judgment on

Darbha's claim of harassment and hostile work environment.


### CONCLUSION AND ORDER

For the reasons stated, the Court grants Capgemini's motion for summary judgment in

its entirety.

_____
Virginia M. Kendall
United States District Court Judge
Northern District of Illinois


Date: March 6, 2012

21